FRANKLIN H. HALL, PETITIONER-RESPONDENT, v. COUNTY OF OCEAN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 18, 1962—Decided March 1, 1962.

Before Judges GOLDMANN, FOLEY and MOLINEUX.

*Mr. Henry H. Wiley* argued the cause for respondent-appellant (*Messrs. Berry, Whitson & Berry,* attorneys).

*Mr. Wilbert J. Martin, Jr.,* argued the cause for petitioner-respondent.

GOLDMANN, S. J. A. D. Respondent employer appeals a County Court judgment awarding petitioner compensation for an injury to his hands sustained out of and in the course of his employment. The Workmen's Compensation Division had earlier dismissed the claim petition.

The question here, as in the Division and the County Court, is whether the condition of petitioner's hands, known as Dupuytren's Contracture, was the result of a single traumatic incident.

Petitioner was employed by respondent county as a jail guard. He was 42 years old and weighed about 240 pounds at the time of the accident on August 16, 1957. He testified that as he was hurrying up the stairs in the jail he tripped and fell forward. The top of his fingers on both hands hit the edge of a step and his hands came to rest with the fingers bent backwards against the vertical riser, the heel of his palms resting on the tread below. He saw the jail physician, Dr. Hayden, the same day. The doctor died before the hearing in the Division. His jail record book contained a notation dated August 17, 1957 reading:

"Franklin Hall, jail guard, sprained palmar tendons, both hands today. Soak in hot Epsom Salts every hour for one-quarter of an hour."

Petitioner said that his hands swelled and became discolored. After a time the swelling subsided and finally disappeared. He saw Dr. Hayden five or six times in all and did not require the help of any other physician. He lost no time from work.

Petitioner testified he had worked at the jail for some four years. Prior to that time he drove long-distance busses for some nine years, his work week being 48 hours. The busses weighed 15 to 18 tons and did not have power steering. Petitioner said he experienced no difficulty with his hands while driving the busses, nor at any time before the accident.

Petitioner's medical expert, Dr. David J. Graubard, a traumatic and orthopedic surgeon, had examined him on October 6, 1959. The history he obtained was essentially the same as that testified to by petitioner. His examination revealed that petitioner had a thinning of the palmar fascia with nodular formation, skin contraction and restriction in the mobility of the metacarpal phalange joints of the index, middle, ring and little fingers of the right hand, and the same type of pathology (but to a lesser degree) involving primarily the ring and middle fingers of the left hand. Because of the nature of the fall and the history of discoloration of the hands, it was his opinion that petitioner had suffered a tear in the palmar fascia, resulting in the Dupuytren's Contracture. In response to a hypothetical question reciting a history of no disability in the hands prior to the fall, the details of the fall and the jail physician's record—but containing no reference to petitioner's bus-driving experience — Dr. Graubard gave the following opinion:

"This individual had an inherited predisposition and * * * the trauma that he sustained produced the Dupuytren's contraction that I found on October 6, 1959."

The deputy director said he was "intrigued" by the statement that petitioner had an inherited predisposition and inquired of the doctor whether he so concluded by reason of the results of the fall or tests performed. His answer was, "By the results." He explained that his opinion as to causal connection was based on the fact that petitioner allegedly had no physical disability prior to the accident, "the rapidity of development of this condition in his hands in which there was evidence of trauma with swelling in the palm, and subsistence of swelling to the formation of nodules." On cross-examination Dr. Graubard rejected the suggestion that petitioner's nine years of bus-driving would predispose him to Dupuytren's Contracture, his reason being

that there was no evidence to show that petitioner had the condition prior to his fall.

Respondent employer presented two medical experts, Dr. Edwin J. Otis and Dr. Joseph G. Villapiano. Dr. Otis, an orthopedic surgeon, said he was familiar with Dupuytren's Contracture and in his opinion, based on personal experience, that condition was almost never due to trauma. Answering the hypothetical question, he said the accident was not the cause of the condition he found when he examined petitioner's hands. The deputy director asked if it was not a fact that "there is practically no likelihood at all that any single trauma would cause a Dupuytren Contracture?" The witness agreed. Although he acknowledged that many doctors felt that Dupuytren's Contracture might, where it existed, be aggravated by repeated trauma over a period of time. his own personal experience was that trauma, either single or repetitious, could not cause that condition. Dr. Otis further testified that "Practically most men who know anything about this disease and have studied this pathology believe it is an inflammatory disease, and that has been pretty well established." Asked again if the contracture could not be caused or aggravated by trauma, he replied "I am not saying it couldn't. There is always a remote possibility, but let us put it this way, it usually is not."

Dr. Villapiano had been doing orthopedic surgery for some 30 years and had been interested in Dupuytren's Contracture for almost all of that time. Based upon his experience, it was his opinion that petitioner's condition was not related to the fall.

Although respondent's two medical experts relied on personal experience gained from such cases of Dupuytren's Contracture as came to their attention in their practice— Dr. Otis' being limited to five years—Dr. Graubard had in the course of his specialty made an extensive study of that condition. He testified, without contradiction, that he had studied more than 1,000 cases of Dupuytren's Contracture involving occupational exposure or following upon occupa-

tional trauma, as related to compensation claims in the States of New York and New Jersey and before the Federal Compensation Board. In 1950 he launched a survey to determine the cause of Dupuytren's Contracture and was successful in 325 (the number was actually 329) cases. Dr. Graubard said that his studies led him to one conclusion:

"* * * that these individuals have an inherited predisposition, which predisposition lies dormant until such time as either occupational exposure—and by that I mean the constant minute trauma over the course of years—which pressure is placed upon the palms of the hands, *or even one specific acute trauma* would be the participating factor for the development of Dupuytren's contraction, which is also called a primary tip [*sic*] of palmar fascia fibrosis, and I determined that the individuals that are so predisposed have an inherent or inherited blood type factor known as RH prime and RH double prime, which occurs approximately in six percent of the white population of the United States." (Italics ours)

The results of his study, he said, were published in the *Journal of the International College of Surgeons*.

Counsel agreed that the court might consult the study, and we have been supplied with reprints of the article, Graubard, "Dupuytren's Contracture—An Etiologic Study," 21 *Journal of the International College of Surgeons, No.* 1 (January 1954). In the introductory paragraph to his paper, Dr. Graubard pointed out that Dupuytren's Contracture at various times has been attributed to or associated with a number of physical conditions, among them cogenital syphilis, parathyroid insufficiency, thyroid dysfunction, diabetes, coronary artery disease, peripheral nerve disease, and various neurological conditions—citing the respective medical publications so holding.

Dr. Graubard's study involved 329 cases presented before the New York Workmen's Compensation Board as cases of occupational disease or traumatic sequelae. In each case employers had questioned the causal relation between occupation and the development of Dupuytren's Contracture. Dr. Graubard gives a number of tables indicating the distribution of the cases according to industry, age and place of

birth. Eighty patients were examined for the Rh factor in an attempt to determine any common genetic factor. The blood of all 80 was of the $Rh_1Rh_2$ type. Statistically, this factor occurs in 12.9% of the white population in the United States, as determined from 7,317 examinations. This led Dr. Graubard to conclude that persons having the blood factor "may have an inherited predisposition to the development of Dupuytren's Contracture. The condition itself, I believe, is the result of trauma—either a single trauma or a series of minute traumas."

After considering the anatomic and functional character of the palm in relation to Dupuytren's Contracture, Dr. Graubard states in his monograph:

"* * * It is therefore apparent that manual workers who in the performance of their work must constantly handle such tools or objects, or must push, lift or carry heavy objects such as barrels, are continually subjecting their hands to undue pressure, specifically in the vicinity of the fourth metacarpal. As a result of this recurrent pressure and of the minute traumas thus imposed, partial rupture of the fibres of the aponeurosis [lying beneath the skin and superficial fascia of the palm] and subsequent hemorrhage produce in certain persons the hypertrophy of the palmar fascia which results in contracture."

Dr. Graubard further concludes from his study that Dupuytren's Contracture may also result from a single injury. He found 14 persons in whom contractures developed after they had sustained fractures of the hand. In 76 cases Dupuytren's Contracture developed after a laceration involving the palmar surface of the hand.

Although in the summary and conclusion of his paper Dr. Graubard notes that Dupuytren's Contracture is not peculiar to any specific industry, but "will develop in persons with an inherited predisposition [indicated by genetic study of the Rh factor] when they are employed in any industry which calls upon them to use their hands excessively in grasping, pushing or pulling," it will be seen that in 90 (14 plus 76) of the 329 cases he studied, Dupuytren's Contracture resulted from a single injury.

The paper we have summarized is the most recent, comprehensive and carefully considered study of Dupuytren's Contracture which counsel have been able to bring to the attention of the court. It confirms that recurrent minute traumas may result in contracture in certain persons—a medical fact familiar to those who hear and determine compensation matters. Indeed, the deputy director who sat in this case said that he had had considerable experience with just such situations. And see *Walsh v. Kotler,* 46 *N. J. Super.* 206 (*App. Div.* 1957), affirming 43 *N. J. Super.* 139 (*Cty. Ct.* 1956) (Gaulkin, J. C. C.); *Duncan v. T. I. McCormack Trucking Co.,* 43 *N. J. Super.* 352 (*App. Div.* 1956) (Francis, J. A. D.); *Schneider, Workmen's Compensation* (*perm. ed.*) 1959 *Cum. Supp., vol.* 2, § 263, and 1960 *pocket part, p.* 32. See also the New York Supreme Court decision in *Sullivan v. Perez* (*N. Y. Law J.,* October 1956) (not officially reported), where Judge Aurelio acknowledged the prevalence of cases where Dupuytren's Contracture was produced by repeated traumas, but noted that there were cases on record in which a single trauma was considered responsible for the condition, referring to Tord Skoog's authoritative monograph published in 96 *Acta Chirurgica Scandiadica, Supp.* 139 (1948).

In finding for respondent the deputy director noted that although the Division took a very liberal view in compensation cases, he knew of no case holding that a single trauma could cause Dupuytren's Contracture. His experience had been that there had to be repeated trauma over a considerable period of time. He referred to the *Walsh* and *Duncan* cases, cited above, involving a history of repeated traumas. He characterized Dr. Graubard's testimony as "one of the most fantastic medical theories I have been called upon to listen to in a long time. * * * It is apparently a pet medical theory that he has. I have never known it to be accepted by any other doctors." Although the deputy director could not agree with Dr. Otis' view that repeated trauma would not cause, aggravate or accelerate Dupuytren's Contracture,

he did not feel that he could accept Dr. Graubard's "unusual theory" and disregard the testimony of Doctors Otis and Villapiano who, he said, "had just as much experience if not more than he in the field of orthopedic trauma, particularly in compensation"—an opinion we do not share. Since the basis of the case was a single trauma, petitioner, said the deputy director, had to stand or fall on that theory. The deputy director concluded that the preponderance of credible testimony did not satisfy him that the fall described by petitioner was the competent, producing cause of the Dupuytren's Contracture.

The County Court reversed, first noting the impressive qualifications of Dr. Graubard and then making new findings as to credibility. The approach of the County Court judge is in marked contrast with that of the deputy director, whose remarks were openly antagonistic to Dr. Graubard even when he was clearly correct. One example of this will suffice. In giving his opinion, Dr. Graubard had mentioned a history of hemorrhage within the palm, and then more correctly stated that there was a history of discoloration, as petitioner had testified. The deputy director insisted there was no history of discoloration—"there isn't one iota of testimony to that respect."

This case turns on the relative credibility to be accorded the medical experts. Although petitioner had only one expert, his qualifications entitled his testimony to be accorded considerable weight, as did his definitive, authoritative study of Dupuytren's Contracture. By contrast, respondent's two doctors relied on a more limited experience, apparently based on their practice alone. The opinion of Dr. Otis can be given little weight; indeed, as noted, the deputy director found himself in disagreement with the doctor's view that repeated trauma could not bring on Dupuytren's Contracture. Dr. Villapiano's opinion, given in answer to the hypothetical question, amounted to nothing more than a conclusionary two-sentence assertion of no causal connection, without any reasons stated in support.

Although, under *Russo v. United States Trucking Co.,* 26 *N. J.* 430, 435 (1958), and like decisions, due regard must be given the findings of the deputy director concerning credibility, "due regard" does not mean that when one medical expert's qualifications and specialized study and experience clearly outweigh those of opposing experts, the County Court judge should not assess and give greater weight to the former. His duty, as ours on review, is to analyze, re-evaluate and re-weigh the evidence.

When petitioner tripped and fell on the jail stairs, he instinctively extended his arms to break his fall. His hands travelled some three feet, and all of his 240 pounds, with the momentum of the fall behind him, came to bear on the ends of his fingers. His hands slipped from the edge of the stairs and came to rest in such fashion that his backward-bent fingers and palm formed an obtuse angle as his fingers slid down the perpendicular of the riser and the heel of his palms came to rest on the step below. There was immediate pain, followed by swelling and discoloration. The jail doctor, who saw him the same day, described the condition of the hands as "sprained palmar tendons."

A sprain involves a sudden or violent overstrain or wrenching, usually accompanied by swelling and inflammation. *Webster's New International Dictionary* (2d ed. 1943). The discoloration, or "hemorrhage," as Dr. Graubard described it, bespoke injury to the anatomy of the hand beneath the palmar skin. After the swelling and puffiness described by petitioner had subsided, it was followed by the nodular formation, skin contraction and restriction of mobility which Dr. Graubard found upon examination.

We need not speculate that the blow may have triggered a palmar condition having its origin in petitioner's nine years of bus-driving. That, as we have noted, was not petitioner's theory, although it well might have been. We are satisfied from a consideration of all the evidence that the present condition of his hands is the result of the sudden, violent insult suffered by his palms when he fell. We are in

agreement with the County Court judge that petitioner established his case by a preponderance of the probabilities, based on believable evidence.

Affirmed.